Filed 4/24/13  In re B.B. CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re B.B. et al., Persons Coming Under the Juvenile Court Law. | B243087 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>AMY R.,<br><br>        Defendant and Appellant. | (Los Angeles County Super. Ct. No. CK78093) |

        APPEAL from order of the Superior Court of Los Angeles County,
Margaret Henry, Judge.  Affirmed.

        Rich Pfeiffer, under appointment by the Court of Appeal, for Defendant and
Appellant.

        John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and
Navid Nakhjavani, Deputy County Counsel, for Plaintiff and Respondent.

_____

Amy R. appeals from the order of the juvenile court terminating her parental rights to Brent (age 8 years) and Heidi (age 2 years). She contends the court abused its discretion in denying her petition for modification seeking to gain custody of the children. (Welf. & Inst. Code, § 388)[1] She also challenges the designation of the children's caretakers as their prospective adoptive parents. (§ 366.26, subd. (n)(1).) We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *The dependency*

In the summer of 2009, the Department responded to a referral from a Maria P. who explained that Amy, who was eight months pregnant, had left Brent with a friend and disappeared. The friend turned Brent over to Maria. Maria called the police because she did not know Brent or Amy and did not want to assume responsibility for the child. Brent declared that he and Amy were homeless and he was happy to be going into foster care.

Military records and other sources revealed Amy suffers from depression, post-traumatic stress disorder, and bipolar disorder, but had refused treatment and medication. She is a victim of domestic violence. Amy is a veteran who had been raped by another member of the armed forces. It was suggested that her rapist was Brent's biological father and was incarcerated. Amy was honorably discharged because she lacked child care for her daughter, Jasmine.[2] She also tested positive for alcohol and marijuana.

The Department of Children and Family Services (the Department) has a history of referrals concerning Amy dating back to 2005, in which she had refused to cooperate and to disclose her whereabouts.

---

[1] All further statutory references are to the Welfare and Institutions Code.

[2] Jasmine, who is apparently living with her father in Jamaica, is not a party to this appeal.

2

Amy first contacted the Department in August 2009 after Brent was detained and she had given birth to Ryan.[3] She visited Brent at the Department's office once and disappeared again. A month later, Amy returned and explained that she had gone to her aunt in Bakersfield for assistance in caring for Ryan.

In November 2009, the juvenile court sustained a petition alleging Amy's abandonment of Brent without an appropriate plan or necessities for the child's care, her disappearance, and her mental and emotional problems, her failure to take prescribed medication, and her history of substance abuse, all put Brent at risk of harm. (§ 300, subds. (b) & (g).) The court declared Brent a dependent and removed him from Amy's custody. As reunification services, the court ordered Amy to undergo individual counseling to address case issues, drug rehabilitation with random drug and alcohol testing, a psychological evaluation, and parenting classes. The court awarded Amy monitored visitation once she contacted the Department.

2. *The reunification period*

a. *Amy's whereabouts*

For most of this three-year dependency, from July 2009 to June 2012, Amy's whereabouts were unknown and she failed to maintain contact with her social workers, family, or counselors. She also has a history of abandoning her children and ceasing contact with them during her disappearances. Much of this record involves descriptions of the Department's attempts to locate Amy.

In October 2009, Amy disappeared and no one at the Department saw her again until June 2011. She telephoned the Department sporadically during this period, the first time in January 2010.

Amy was at the maternal grandmother's house in Michigan in January 2010 but vanished again in March 2010, although Ryan's caretaker claimed to have seen her in court in February 2010 dressed in a disguise.

---

[3] Ryan was permanently placed in Michigan and is not a party to this appeal.

3

The court in Cass County, Michigan took jurisdiction over Ryan. The Michigan Child Protective Services (CPS) reported that Amy had effectively abandoned Ryan and failed to maintain contact with CPS or the Department.

In the spring of 2010, the Department reached Amy who reported she was in California. However, she did not reveal her whereabouts.

Amy left a message with the social worker at the end of June 2010 requesting a visit with Brent. By the time Amy called back, Brent had left on a trip to his grandparents' house in Michigan. Amy reportedly went back to Michigan in July 2010, pregnant and due to give birth in October 2010.

CPS sent Brent back to California in October 2010 on an emergency basis as his grandparents were not equipped to care for him. Brent reaffirmed he did not want to live with Amy, who was mean to him and hit him a lot. Brent disclosed to his caretaker that Amy would " 'beat' him with a stick."

In November 2010, the Department indicated that Amy had not maintained contact with Brent or the Department. Amy failed to appear for an October 2010 meeting she arranged with the Department. She also failed to contact the maternal grandmother in Michigan, who was in the process of adopting Ryan. The grandmother speculated that Amy was hiding from the Department and CPS. The Department recommended terminating reunification services because Amy failed to reunify with Ryan in Michigan and had made no attempts to reunify with Brent.

Amy gave birth to Heidi in California in late 2010, the Department learned. It filed a petition naming Heidi, although it did not know where Amy and the infant were. At the Department's request, the juvenile court issued a protective custody warrant for Heidi as Amy had not complied with her services and was considered a flight risk, putting the child at risk of neglect and abuse.

Amy was still missing when the juvenile court terminated reunification services for Amy and Brent in January 2011. Despite efforts, the Department was unable to locate Amy as late as April 2011.

4

In June 2011, Amy met with the social worker who took Heidi into protective custody. In July 2011, six months after reunification services were terminated, the Department reported that Amy began to make herself available to the Department and to participate in regular visits with both Brent and Heidi.

b. *Alcohol and drug rehabilitation and random testing; therapy; and visits*

When Brent was detained, Amy tested positive for alcohol and then missed ten more tests. The hospital records indicate that Ryan tested negative for drugs at birth in August 2009. Otherwise, the record contains no information about drug and alcohol testing or rehabilitation during the reunification period.

Amy reported in July 2010 that she had enrolled in individual counseling and was scheduled to begin drug counseling and testing at the Veterans' Administration (VA). However, the woman at the VA Amy had identified as her contact did not know Amy's whereabouts and was a case manager at the housing program not a drug counselor. In December 2010, Amy's psychiatrist reported that she had not seen or heard from Amy in "several months." The record is thereafter silent about therapy during reunification.

The Department verified that Amy visited Brent once each in August and September 2009, and twice in October, 2009. She called Brent in January 2010. In a telephone call with the social worker in April 2010, Amy reported she had visited Brent. She called the child twice in July 2010 when he was in Michigan, but did not communicate with him between October 2010, when he returned from Michigan, and June 2011.

Long after reunification services were terminated for Amy and Brent, in late 2011, Amy began regular, weekly visits with the children. Amy preferred to sacrifice a visit than to agree to a monitor she did not like. The visits ceased in April 2012 until May 30, 2012. The Department noted that when Amy cancelled visits, Brent would become angry and misbehave. The misbehavior correlated with the lack of consistency in Amy's visits.

3. *Post-reunification*

Nine months after reunification ended, in October 2011, the juvenile court sustained a petition on behalf of Heidi (§ 300, subds. (b), (g), & (j)), to which Amy pled

5

no contest, and removed her from Amy's custody. The court denied reunification services because Amy had not made reasonable efforts to treat the problems that led to the removal of Heidi's siblings. The court awarded Amy monitored visits with Heidi.

Meanwhile, in late 2011, the Department found an adoptive placement for both Brent and Heidi with Mr. and Mrs. L. Brent, who was excited to be adopted, moved into the L.s' house in March 2012 and Heidi arrived in April 2012. Brent adjusted to his placement with the L.s and stated he was "happy." He stated "I love it here at my home. I have my own room, Heidi gets to live with me, and she has [her] own room." The home was safe and clean. As of June 2012, both children were being "very well cared for" by the L.s.

4. *Amy's section 388 petition*

In April 2012, Amy filed a section 388 petition seeking either return of the children to her custody and reinstatement of reunification services, or transfer of the case to Nevada, where she had moved in January 2012. As changed circumstances, Amy asserted she had completed parenting classes and attended an "adequate" amount of monitored visits with the children. She also claimed she had a psychiatric evaluation that concluded Amy was competent to care for her children. The petition made no mention of substance abuse treatment, testing, or individual counseling. The modification was in the children's best interest, Amy asserted, because the children would be together in a stable home, with their own rooms, private school, a safe neighborhood, and Amy would enrich their lives "with love building confidence and self-esteem."

The petition included the following documents: (1) An August 10, 2011 letter from the VA explaining that Amy had attempted to enroll in parenting classes but the VA did not offer such classes. (2) A certificate of training in parenting skills dated September 2010. (3) A sign-in sheet from Parents Anonymous indicating Amy had attended four meetings in October and November 2011 and one in January 2012; (4) A letter from the deputy sheriff who detained Heidi from Amy and found the child to be happy, well fed, and clean; (5) Amy's transcript and diploma from ICDC College for completing a training course in computerized accounting; (6) Pictures of a bedroom; and

6

(7) A psychiatric evaluation of Amy by Ryan Davis, M.D. based on statements only she provided. Dr. Davis found Amy to be "psychiatrically competent" to care for her children but emphasized that without collateral information, his letter was merely a clinical interview and assessment, "which is only part of the overall decision." Dr. Davis "highly" recommended that Amy undergo psychological testing, as it is a customary part of any comprehensive psychological assessment. Given what Amy had disclosed, he "highly" recommended she enter individual therapy.

The Department opposed the petition noting Amy had not demonstrated a satisfactory level of compliance with her case plan. There was no evidence she had addressed any psychological issues. Brent disclosed that when he lived with Amy, she beat him and there was no evidence Amy had received counseling for her history of domestic violence. Amy's visits were inconsistent and so Brent had started displaying anxiety and anger. Also, the Department was unable to obtain information about Amy's participation or progress in parenting classes. The program Amy claimed to have completed was an online class designed to meet family law requirements, and so it was unsatisfactory for the Department's purposes. The telephone number for Amy's Parent's Anonymous program was no longer in service.

At the hearing on her section 388 petition, Amy presented a certificate of completion from an expedited six-week parenting class in Las Vegas, Nevada. Amy stated she had been drug testing at the VA and had submitted her test results to the court in the summer of 2011. She last tested four weeks before the hearing. Amy admitted she did not give Dr. Davis any of the Department's reports for his evaluation.

At the permanent planning hearing, (§ 366.26), the juvenile court denied the section 388 petition. Noting Amy was more stable than before, the court found there was insufficient change in circumstances and so it would not be in the children's best interest to be returned to Amy's custody. After terminating Amy's parental rights, the court declared the L.s the children's prospective adoptive parents at the request of the children's attorney. Neither Amy nor her counsel objected. Amy appealed.

7

CONTENTIONS

Amy contends the juvenile court erred in denying her section 388 petition and in designating the L.s as the prospective adoptive parents.

DISCUSSION

1. *The juvenile court did not abuse its discretion in denying Amy's section 388 petition.*[4]

"Under section 388, a parent may petition the court to change, modify, or set aside a previous court order.  The petitioning party has the burden of showing, by a preponderance of the evidence, that [(1)] there is a change of circumstances or new evidence, and [(2)] the proposed modification is in the minor's best interests. [Citations.]"  (*In re S.M.* (2004) 118 Cal.App.4th 1108, 1119.)  "It is not enough for a parent to show *just* a genuine change of circumstances under the statute.  The parent must show that the undoing of the prior order would be in the best interests of the child. [Citation.]"  (*In re Kimberly F*. (1997) 56 Cal.App.4th 519, 529.)  A petition under section 388 is addressed to the juvenile court's sound discretion and on appeal we will disturb the decision only on a clear showing of abuse of that discretion.  (*In re Jasmon O*. (1994) 8 Cal.4th 398, 415.)

Manifestly Amy has not carried her burden under the first prong of the section 388 test to show changed circumstances.  The Department was unable to verify Amy's participation or progress in her Las Vegas parenting classes, Parents' Anonymous, or the online classes, which were not even designed for dependency purposes.  Thus, Amy failed to demonstrate a change in this portion of her case plan.  Dr. Davis' report was specifically identified as a "clinical interview and assessment," not a full-blown evaluation and he highly recommended she undergo therapy, something she has not done.

---

[4]     We decline the Department's invitation to treat this issue as forfeited because Amy's notice of appeal indicated only that she was appealing from the termination of parental rights and did not mention the denial of her section 388 petition.  We liberally construe the notice of appeal in the interest of justice.  (Cal. Rules of Court, rule 8.100(a)(2).)

Finally, Amy's claim that she had an "adequate" amount of visits with her children underscores her inconstancy in their lives. Throughout this lengthy dependency, Amy has abandoned her children and disappeared. She has been out of touch with her children more than she has been in communication with them, let alone visited them. After ignoring Brent for years, Amy only began visiting him nine months after reunification was terminated and then she disappeared again for a month just before the section 366.26 hearing. In sum, Amy's evidence does not demonstrate her circumstances actually changed.

On appeal, Amy argues that the juvenile court erred in finding her new housing in Nevada did not constitute a sufficient change in circumstances. Not so. The juvenile court was justified in concluding, in view of the protracted period of instability lasting all of Brent's life, the fact Amy had moved to Nevada only three months before filing her section 388 petition, although an improvement, did not signal sufficient stability to risk returning the children to her custody.

In addition to the lack of changed circumstances, Amy has not demonstrated the second prong of the section 388 test, namely how returning the children to her care would be in their best interest. Among the factors juvenile courts consider in determining whether a proposed change of order is in the children's best interest are: (1) "the seriousness of the problem which led to the dependency, and the reason for any continuation of that problem;" (2) "the degree to which the problem may be easily removed or ameliorated, and the degree to which it actually has been," and (3) "the strength of relative bonds between the dependent children to *both* parent and caretakers." (*In re Kimberly F., supra,* 56 Cal.App.4th at p. 532.)

"After the termination of reunification services, a parent's interest in the care, custody and companionship of the child is no longer paramount. [Citation.] Rather, at this point, the focus shifts to the needs of the child for permanency and stability. [Citation.]" (*In re Angel B*. (2002) 97 Cal.App.4th 454, 464.) "[O]n the eve of the section 366.26 permanency planning hearing - the children's interest in stability was the court's foremost concern and outweighed any interest in reunification. [Citation.]" (*In re*

9

*Edward H*. (1996) 43 Cal.App.4th 584, 594.) "In fact, there is a rebuttable presumption that continued foster care is in the best interest of the child [citation]; such presumption obviously applies with even greater strength when the permanent plan is adoption rather than foster care. A court hearing a motion for change of placement at this stage of the proceedings must recognize this shift of focus in determining the ultimate question before it, that is, what is in the best interest of the child. [Citation.]" (*In re Angel B*., *supra*, at p. 464.)

Amy's penchant for abandoning her children, disappearing, and constantly moving, from California to Michigan and back, to Bakersfield, and to Nevada, is the central instability in these children's lives. Reunification services were terminated 15 months before Amy filed her section 388 petition and she still has not demonstrated she addressed her nomadic lifestyle. Foster care was presumptively in the children's best interest.

Furthermore, Amy has serious psychological issues and she has not participated in counseling, the need for which was reiterated recently by Dr. Davis. Nor has she undergone drug and alcohol rehabilitation. The only evidence in the record of alcohol testing were her results from 2009 and 2010, nearly two years before she filed her section 388 petition. Meanwhile, Brent declared he does not want to live with Amy and is excited about his adoption. He is bonded with his prospective adoptive parents who are stable and constant. Given Amy has (1) not complied with her case plan, (2) failed to regularly visit Brent for nearly the entire dependency, (3) not begun to address the causes of the dependency in therapy and rehabilitation, and (4) had no stable housing for any appreciable period of time, the prospect of returning the children to her custody or reinstituting reunification simply would not promote stability for Brent and Heidi and therefore would not be in their best interests. (*In re Edward H*., *supra*, 43 Cal.App.4th at p. 594; accord *In re Angel B*., *supra*, 97 Cal.App.4th at pp. 464-465.) The juvenile court did not err.

2. *Amy forfeited the right to challenge the order designating the L.s as the children's prospective adoptive parents.*

"[A] reviewing court ordinarily will not consider a challenge to a ruling if an objection could have been but was not made in the trial court. [Citation.] The purpose of this rule is to encourage parties to bring errors to the attention of the trial court, so that they may be corrected. [Citation.]

"Dependency matters are not exempt from this rule. [Citations.] [¶] [A]pplication of the forfeiture rule is not automatic. [Citations.] But the appellate court's discretion to excuse forfeiture should be exercised rarely and only in cases presenting an important legal issue. [Citations.] Although an appellate court's discretion to consider forfeited claims extends to dependency cases [citation], the discretion must be exercised with special care in such matters. 'Dependency proceedings in the juvenile court are special proceedings with their own set of rules, governed, in general, by the Welfare and Institutions Code.' [Citation.] Because these proceedings involve the well-being of children, considerations such as permanency and stability are of paramount importance. (§ 366.26.)" (*In re S.B.* (2004) 32 Cal.4th 1287, 1293, fn. omitted.)

Amy contends the juvenile court erred in designating Mr. and Mrs. L. as prospective adoptive parents for Brent and Heidi because under section 366.26, subdivision (n)(1),[5] the children must have been residing with the L.s for six months before they can be designated as the prospective adoptive parents. Yet, Brent and Heidi had been living with the L.s for three months at most by the time of the designation. Amy has forfeited the issue. Both she and her attorney were present at the hearing, and neither one objected. This is not the kind of issue that would justify excusing the forfeiture; it is one of the many decisions the juvenile court makes in a protracted

---

**5** Section 366.26, subdivision (n)(1) reads, "Notwithstanding Section 8704 of the Family Code or any other provision of law, the court, at a hearing held pursuant to this section or anytime thereafter, may designate a current caretaker as a prospective adoptive parent if the child has lived with the caretaker for at least six months, the caretaker currently expresses a commitment to adopt the child, and the caretaker has taken at least one step to facilitate the adoption process."

11

dependency in which the loss of parental rights are at issue. Amy's argument is unavailing that where the Department's attorney mislead the court as to the law under section 366.26, County Counsel "does not have clean hands to object" on appeal to Amy's challenge to the designation ruling. The Department's confusion about the state of the law does not absolve Amy of her responsibilities.

Moreover, Amy does not have standing to raise the placement issue. Whether a party has standing focuses on whether that person has "a legally cognizable immediate and substantial interest which is injuriously affected by the court's decision." (*In re Carissa G.* (1999) 76 Cal.App.4th 731, 734.) Amy's parental rights were terminated *before* the court designated the L.s as the prospective adoptive parents. Thus, Amy was not aggrieved by the court's designation, even if it were erroneous.

Finally, even were we to consider the contention, we would reject it. Although the L.s had not yet cared for the children for six months as required by the statute to qualify as prospective adoptive parents, more than six months have since passed, and Amy has not demonstrated prejudice requiring reversal. Meanwhile, these children are in a permanent, stable home, a factor that is of overriding importance.

DISPOSITION

The order is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

ALDRICH, J.

We concur:

KLEIN, P. J.

CROSKEY, J.

13